IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 6, 2002

## STATE OF TENNESSEE v. WILLIE NATHANIEL SMITH

**Appeal from the Circuit Court for Tipton County**
**Nos. 4149, 4251    Joseph H. Walker, III, Judge**

---

**No. W2001-02973-CCA-R3-CD  - January 9, 2003**

---

The defendant, Willie Nathaniel Smith, appeals as of right his conviction by a jury in the Tipton County Circuit Court of delivery of .5 grams or more of cocaine, a Class B felony, and his resulting fifteen-year sentence. He also appeals the concurrent fifteen-year sentences received following his guilty pleas to two additional counts of delivery of .5 grams or more of cocaine. He contends (1) the evidence is insufficient to support his conviction in case number 4149; (2) the trial court erroneously allowed a police investigator to testify about what he heard on a recording device; and (3) his sentences in both cases are excessive. We affirm the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Gary F. Antrican, District Public Defender, Somerville, Tennessee, and Jeffery L. Stimpson, Munford, Tennessee, for the appellant, Willie Nathaniel Smith.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Kim E. Linville, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Case number 4149 arises out of a police informant's controlled purchase of crack cocaine from the defendant. At trial, Aubrey Blackwood testified that in July 2000, he quit his crack cocaine habit and began working for the drug task force through Investigator Randall Robbins, whom he had known for twenty years. He said that he usually received $60 per transaction but that he was paid even if he did not make the purchase. He said that on August 23, 2000, he discussed the price of an eight ball of crack cocaine with the defendant in a house in front of Mr. Blackwood's father's auto repair shop. After the defendant left, he telephoned Investigator Robbins and told him the price was $170. He met Investigator Robbins around 7:00 p.m., and they talked about the job. Investigator

Robbins searched Mr. Blackwood and his truck, placed a body wire on Mr. Blackwood, and gave him money. Mr. Blackwood said that he did not have any of his own money with him that evening. From the meeting spot, Investigator Robbins followed him to the entrance to Maclin Road.

Mr. Blackwood testified that when he arrived at the defendant's house, Tim Powell was leaving in a black Chevrolet truck. He said that the defendant let him in and that Joseph Rivers and a woman named Victoria or Torey were there. He said that the defendant was smoking marijuana and looking down his road with binoculars. He said that the defendant said he did not have the amount they had discussed but had only five rocks. He said that the television was playing loudly and that he asked the defendant about the size of the rocks. He said that the defendant showed him the smallest rock, which was tied in the corner of a clear plastic bag. He said the other rocks were wrapped in aluminum foil. He said that the defendant priced the rocks at $100 but agreed to take $80 for them. He said that after he bought the five rocks for $80, the defendant asked him how much money he had. He said that he counted out $90 and that the defendant told him to return in fifteen minutes when the defendant would produce the eight ball and give him a better deal. He said that Joseph Rivers was sitting at the defendant's kitchen table smoking and that he joked with Mr. Rivers. He said that the defendant, who seemed worried, asked whether a grey and maroon Bronco that had been seen in the area belonged to the police. Mr. Blackwood said he thought that the defendant was referring to Investigator Robbins' car and he tried to throw the defendant off by saying he had not seen the Bronco. He said that before he left, he told the defendant that he would be back for the eight ball.

Mr. Blackwood testified that he drove back to the meeting place and that Investigator Robbins followed him. He said that he gave Investigator Robbins the rocks and the money and that the investigator searched him and his truck. He said he did not return to the defendant's house for the eight ball. He said that he had listened to the audiotape recording of the transaction and that it accurately portrayed the events of that evening. He said he did not buy drugs from or give money to Mr. Rivers or Victoria.

On cross-examination, Mr. Blackwood testified that he had smoked crack for one year and had last smoked crack in July 2000. He admitted being convicted in January or February 2001 of theft of property valued over $1000 and theft of property valued over $500. He said that he was charged with these offenses before he worked for the drug task force but that he declined the task force's offer to help him with these charges. He said he also had a drug conviction in 1988. He said he had known the defendant, who lived within one-quarter of a mile from his father's shop, for about one and one-half years. He agreed that he and the defendant were friends and said that the defendant had bought car parts from him and had hired him as a mechanic in the past. He believed the defendant had been satisfied with the parts and said that he had replaced parts that the defendant said would not work. He said he and the defendant usually traded car parts for crack cocaine. He denied arguing with the defendant about him not refunding the defendant's money when a part would not work or about him taking apart a car for the defendant and being unable to fix it. He said that despite their disagreements about defective parts, they continued to do business with each other. He said he had been to the defendant's house many times but denied ever smoking crack there or elsewhere

with the defendant. He said that he had never loaned the defendant money but that the defendant had allowed him to make a purchase on credit a few times. He agreed that a crack addict would do anything, including lie and steal, to get crack.

Investigator Randall Robbins of the Tipton County Sheriff's Department testified that he worked on the drug task force as a narcotics investigator. He said that he used paid confidential informants from all walks of life on a daily basis. He said that in August 2000, he was using Aubrey Blackwood as an informant. He said Mr. Blackwood called him around 1:00 or 2:00 p.m. to tell him that Mr. Blackwood had arranged to buy an eight ball that night from the defendant, who lived on Maclin Road. He said that he and Agent Mike Rose met Mr. Blackwood that evening on a field road, that they discussed the location of the drug sale, and that he searched Mr. Blackwood's person and truck, finding no money or illegal drugs. He said that he gave Mr. Blackwood $170, for which he had recorded the serial numbers, and placed a body wire on him. He said that in order for the recorder to work, he had to remain within one to one-half mile from the informant, depending on the weather and the terrain. He said that maintaining visual contact with the informant was difficult in a rural county because the area is open and most people know him and his vehicles. He said he typically monitored the informant visually as best he could and tried to stay hidden.

Investigator Robbins testified that they followed Mr. Blackwood to Maclin Road and remained on Bud Eubanks Road, watching Mr. Blackwood's taillights continuing in the direction of the defendant's house. He said he could not see the defendant's house but could see the front porch light. He said that through the recording device, he heard Mr. Blackwood approach the house and speak to an African-American male. He said he heard Mr. Blackwood knock on the door and speak to another African-American male. He said a television was playing in the background. He said that he heard Mr. Blackwood have a conversation with one or two people in the house. He said he heard Mr. Blackwood discussing a transaction involving an eight ball and another person answer that he did not have that much right now. He said he heard a discussion about what the person had and heard Mr. Blackwood say, "You dropped one." He said the person questioned Mr. Blackwood about Investigator Robbins' maroon and grey Bronco, saying that the person believed the police were in the area. He said that he heard Mr. Blackwood count out $90 and that the person told Mr. Blackwood to come back later for the rest. He said he heard Mr. Blackwood leave and then state for their benefit that he was leaving the area. He said that shortly thereafter, he saw Mr. Blackwood turn on his headlights.

The state played the audiotape of the transaction for the jury. The audiotape contains a partially inaudible conversation between Mr. Blackwood and at least one other male. On the tape, Mr. Blackwood asks the person if he has "a good eight." The other person eventually states that he has "five." Mr. Blackwood and the person discuss a red and grey Blazer that the person has seen in the area and believes is associated with the police. Mr. Blackwood denies seeing it. In negotiating the price for the "five," Mr. Blackwood seeks assurance that they are not "real small or nothing." The person states that he has only one that is "real small" and indicates that he is showing it to Mr. Blackwood. Mr. Blackwood points out that the person has dropped one as the person is counting out the five. Mr. Blackwood confirms that the price is $80. The person states either that he had or

will have "the rest of that, . . . a ball," and Mr. Blackwood asks how much more the person will charge. The person asks how much more Mr. Blackwood wants to spend, and Mr. Blackwood states that he has $90 left. He and Mr. Blackwood discuss Mr. Blackwood returning in about fifteen to twenty minutes.

Investigator Robbins testified that after the transaction, he and Agent Rose followed Mr. Blackwood back to the meeting place and that Mr. Blackwood gave him four rock-like substances wrapped in aluminum foil, one wrapped in clear plastic, and $90. He said that he field tested the substances, which tested positive for cocaine. He said that a rock or pea-sized piece of crack cocaine sells for about $20. He said that an eight ball, which is one-eighth of an ounce of cocaine, costs between $150 and $250.

On cross-examination, Investigator Robbins testified that he could not see the people who were talking during the drug transaction and could identify only Mr. Blackwood's voice on the audiotape. He said that when a car would come, he would drive to the nearest driveway and turn around. He said that these movements accounted for the static on the audiotape of the drug transaction. He could not identify a photograph of the defendant's house, explaining that he had been there only once at night. He said that when Mr. Blackwood first came to him, Mr. Blackwood said he did not want to be paid but only to stop using drugs. He said that he had never required informants to take drug screens and that he insisted that Mr. Blackwood be paid. He said Mr. Blackwood did not tell him about his relationship with the defendant.

Special Agent Dana Clement Rose of the Tennessee Bureau of Investigation (TBI) testified that she identified a substance sent to her by Investigator Robbins as 1.2 grams of cocaine. She acknowledged that she did not know from whom the drugs were taken.

Joseph Rivers testified that he had known the defendant for twenty years and that the defendant was like family to him. He said he had never seen the defendant smoke or sell crack cocaine. He said the defendant supported himself by picking up cans, dealing in scrap and junk, and helping Mr. Rivers work on cars. He said he had known Aubrey Blackwood for about five years, had bought car parts from Mr. Blackwood and his father, and had worked as a mechanic for Mr. Blackwood's father. Mr. Rivers stated that he had repaired cars after Mr. Blackwood failed to repair them properly and had bought defective parts from Mr. Blackwood. He said he had to go to Mr. Blackwood's father to get his money back for the defective parts. He said that he would not characterize the defendant and Mr. Blackwood as friends and that he had known them to have conflicts. He said he had seen Mr. Blackwood smoke crack cocaine countless times, including in the defendant's driveway, and last saw him smoking crack at Mr. Blackwood's home in March 2001. He said he could not recall whether he was at the defendant's house on August 23, 2000. Based upon this evidence, the jury convicted the defendant of delivery of .5 grams or more of cocaine.

On November 6, 2001, the defendant pled guilty in case number 4251 to two counts of delivery of .5 grams or more of cocaine, agreeing to allow the trial court to determine the sentence. A codefendant, Victoria Alicia Teran, who lived with the defendant on Maclin Lane, was also

indicted for the delivery of cocaine in that case. At the submission hearing, the state presented the following factual basis for the convictions: For the first offense, which was alleged in count one to have occurred on September 13, 2000, Mr. Blackwood was wired with a recording device and the drug transaction was recorded. The audiotape revealed the codefendant counting out eight rocks. The laboratory analysis showed the eight rocks to be 1.7 grams of crack cocaine. Mr. Blackwood and drug task force officers would testify that the defendant was involved in delivering the eight rocks for $120. For the second offense, which was alleged in count three to have occurred on February 1, 2001, Mr. Blackwood would testify and the audiotape and drug task force officers would corroborate that the defendant showed Mr. Blackwood a rock and measured it. The laboratory analysis revealed this substance to be 1.4 grams of crack cocaine. Mr. Blackwood would testify that "$150 was transferred in an hand-to-hand transaction." The defendant stipulated that a factual basis existed for the guilty pleas. At a joint sentencing hearing, the trial court sentenced the defendant as a Range II, multiple offender to fifteen years in the Department of Correction (DOC) on each of the three convictions, all to run concurrently.

## I. SUFFICIENCY

The defendant contends that the evidence is insufficient to support his conviction in case number 4149 because it rests upon the testimony of a paid informant, who was not credible. He argues that Mr. Blackwood, the only person to link him to the drug transaction, had two theft convictions and admitted that an addict would lie to get crack. He points out that although Mr. Blackwood testified that he had stopped using crack in July 2000, Mr. Rivers testified that he saw Mr. Blackwood use crack in March 2001. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The knowing delivery of .5 grams or more of cocaine is a Class B felony. Tenn. Code Ann. § 35-17-417(a)(2), (c)(1); see also Tenn. Code Ann. § 39-17-408(b)(4) (categorizing cocaine and its derivatives as a Schedule II drug). Viewing the evidence in the light most favorable to the state, Aubrey Blackwood testified that the defendant gave him five rocks of crack cocaine in exchange for $80. The transaction was recorded, and the audible portions of audiotape corroborate Mr. Blackwood's testimony about the number of rocks and the purchase price. Investigator Randall Robbins testified that following the controlled drug sale, Mr. Blackwood gave him five rocks, which field tested positive for cocaine. Special Agent Dana Clement Rose testified that she identified the substance from Investigator Robbins as 1.2 grams of cocaine. The evidence is sufficient to support

the defendant's conviction. The defendant's arguments relate to Mr. Blackwood's credibility, a matter reserved for the trier of fact and not this court. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

## II. ADMISSIBILITY OF INVESTIGATOR ROBBINS' TESTIMONY

The defendant contends that the trial court should not have allowed Investigator Robbins to testify about what he heard on the recording device during the drug transaction. He argues that Investigator Robbins' testimony was not the best evidence of the transaction because the audiotape was available. He also contends that Investigator Robbins' testimony constituted hearsay and was speculative because he could not see the house or identify the voices on the audiotape. He argues that Investigator Robbins' testimony about what he heard during the drug transaction influenced the jury to anticipate a drug transaction before they heard the audiotape. The state agrees that the audiotape was the best evidence of the transaction but contends that Investigator Robbins was merely laying a foundation for the introduction of the audiotape. It argues that Investigator Robbins' testimony was not speculative because he heard the conversation as it occurred through the microphone worn by Mr. Blackwood and could identify Mr. Blackwood's voice.

The best evidence rule extends to audiotaped recordings: "To prove the content of . . . recording . . ., the original . . . recording . . . is required" unless an evidentiary rule or a statute provides otherwise. Tenn. R. Evid. 1002. In the present case, the state presented the original audiotape of the transaction and, thus, the best evidence rule was not offended.

> [T]ape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.

State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980), superceded on other grounds by statute Tenn. Code Ann. § 39-11-505. Aubrey Blackwood, a participant in the recorded conversation, authenticated the audiotape by testifying that he had listened to it and that it accurately presented the conversation between himself and the defendant. He identified the defendant as the person with whom he conducted the recorded drug transaction.

Hearsay is a statement made out of court and offered "to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Typically, testimony by a monitoring officer about a recorded conversation that he overhears does not raise hearsay concerns: The officer can identify the parties to whom he was listening. See Jones, 598 S.W.2d at 223. The statements of the defendant fall within a hearsay exception for admissions by a party-opponent. Tenn. R. Evid. 803 (1.2). Also, the statements of the cooperating party–in this case the police informant, Mr. Blackwood–are not offered for their truth. See Tenn. R. Evid. 801(c), 802; see, e.g., Jones, 598 S.W.2d at 223 (concluding that

the statements of the undercover ally of the state were not offered for their truth–in fact, many of the statements were admittedly false–but only to bring the defendant's statements before the jury).

In the present case, Investigator Robbins contemporaneously monitored the recorded conversation. The defendant argues that Investigator Robbins' testimony about what he heard on the audiotape is improper because he could not identify the voices on the audiotape. He also contends that Investigator Robbins' testimony about the actions of the people speaking on the tape was speculative because he could not see what was happening. Initially, we note that Investigator Robbins aurally witnessed the transaction and could properly testify about what he heard people doing. Additionally, we believe that he could properly testify to the statements of the unknown party to the drug transaction because Mr. Blackwood identified this person as the defendant. Thus, Mr. Blackwood's testimony established the predicate for the admissibility of the statements of the other party to the drug transaction, i.e., that the person was the defendant, a party-opponent. Finally, the defendant was not harmed in light of Mr. Blackwood's detailed testimony about the transaction and the fact that the jury listened to the audiotape.

### III. SENTENCING

The defendant contends that his sentence in case number 4149 is excessive considering the nature of the offense for which he was convicted. With regard to case number 4251, he argues that the trial court should have applied the state's failure to supervise him properly when he was previously on probation as a mitigating factor and imposed the minimum twelve-year sentence. He also challenges the manner of service of his sentence, arguing that the trial court should have placed him on community corrections. The state contends that the trial court properly sentenced the defendant.[1] We affirm the sentences imposed by the trial court.

The presentence report reflects that the twenty-nine-year-old defendant attended school through the tenth grade before leaving for disciplinary reasons. It shows him to be engaged to Victoria Teran, his codefendant in case number 4251, and the father of two children. The defendant reported no mental health problems but said that he had been diagnosed with tuberculosis and had chest pain. He reported working for Discount Beepers from January 31 through October 15, 1999, but leaving this position for health reasons. He stated that he was in the hospital for one month in October and November 1999. He related that he began using alcohol and drugs at age sixteen and that he used alcohol, cocaine, and "weed" daily. The report reveals that between June 1995 and January 1996, the defendant had attended two substance abuse programs, a treatment program entitled Commitment to Change, and an anger management program. He completed only the anger management program.

The presentence report reveals that the defendant was convicted of robbery in 1992 and received a six-year sentence. It shows that he was convicted of three counts of drug offenses relating

---

[1]We note that the state failed to file a brief in case number 4251. Nevertheless, we believe the record is sufficient for us to address the defendant's sentencing contentions in that case.

to cocaine in 1994 and received an effective eight-year sentence. At the sentencing hearing, the defendant disputed that he had three felony drug convictions, arguing that he believed one had been dismissed or was a count charging a codefendant. He noted that the state's notice of intent to seek enhanced punishment only listed two prior convictions for delivery of a controlled substance. The report also reveals that the defendant had misdemeanor convictions for possessing a firearm where alcohol is served, resisting arrest, simple assault, driving on a revoked license, and evading arrest. Additionally, he has two traffic-related convictions for speeding. The report reveals that he was paroled from his robbery conviction on August 4, 1992, but that his parole was revoked on September 24, 1996.

Another report prepared by Corrections Management Corporation contains much of the same information but also reflects that the defendant reported working for a temporary service for an unspecified time period. The defendant stated that he was self-employed as a mechanic and yard worker. He reported last using cocaine and alcohol in February 2001 and last using marijuana on August 3, 2001. This report states that the defendant's three 1994 drug convictions were for possession of a Schedule II substance.

At the sentencing hearing, the trial court relied upon two of the defendant's four felony convictions to establish that he was a Range II, multiple offender. See Tenn. Code Ann. § 40-35-106(a)(1). It enhanced the sentences based upon the defendant's history of criminal convictions beyond those establishing him as a Range II, multiple offender. See Tenn. Code Ann. § 40-35-114(1) (Supp. 2001) (amended 2002).[2] It also found that the defendant had a history of unwillingness to comply with the conditions of release into the community. See Tenn. Code Ann. § 40-35-114(8) (Supp. 2001) (amended 2002). It applied factor (13), finding that the defendant was on probation at the time he committed the present offenses but did not give this factor much weight because the probation was unsupervised. See Tenn. Code Ann. § 40-35-114(13)(C) (Supp. 2001) (amended 2002). The trial court applied mitigating factor (1), that the offense "neither caused nor threatened serious bodily injury," to all three convictions. See Tenn. Code Ann. § 40-35-113(1). The court balanced these factors and imposed a fifteen-year sentence for each conviction. Although it found that the defendant's sentences could be run consecutively, it concluded that such a sentence would be excessive for these offenses. It found that the defendant was ineligible for probation, see Tenn. Code Ann. § 40-35-303(a), and that this was not a proper case for community corrections considering the defendant's prior history of criminal convictions, including a conviction for robbery, see Tenn. Code Ann. § 40-36-106.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is

---

[2]The legislature's 2002 amendment to Tenn. Code Ann. § 40-35-114 added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only in increasing their designating number by one. Thus, former enhancement factor (1) relating to the defendant's history of criminal convictions or behavior is now enhancement factor (2).

improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range for a Class B felony unless there are enhancement factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d)-(e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Cmts.; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

In case number 4149, the defendant argues that his sentence is excessive considering the nature of the offense for which he was convicted. He does not challenge the trial court's application of enhancing or mitigating factors but does indicate in his argument that his relative youth and the fact that he has a young child should mitigate his sentence. A trial court may consider a defendant's youth in mitigation of the sentence if because of his or her youth the defendant "lacked substantial judgment in committing the offense." Tenn. Code Ann. § 40-35-113(6). The record belies the application of this factor. The defendant has a lengthy history of criminal convictions, beginning with his conviction

for robbery at age twenty. Furthermore, Mr. Blackwood testified that he had purchased or traded for crack cocaine from the defendant in the past, which indicates that the defendant had been dealing drugs for some time. The defendant's criminal history, which spans nine of his twenty-nine years, does not indicate that his youth deprived him of substantial judgment in committing the present offenses.

Similarly, we are skeptical of the defendant's argument that he "now has a young child and a reason to live a straight life." The presentence report states that the defendant has a ten-year-old daughter and a son for whom no age is disclosed. The record reflects that his daughter was born within approximately one year of his 1992 robbery conviction. These facts along with the history of criminal convictions and behavior following the 1992 robbery conviction reveal that the defendant has not chosen to abandon his criminal conduct because of his responsibility as a father.

The defendant also indicates that the trial court improperly weighed enhancement factor (1) by arguing that his only violent offense occurred in 1992 and he was likely under the influence of drugs while committing all of his non-drug-related offenses. As noted above, when the record supports the application of an enhancement factor, the weight to be given that factor rests within the trial court's discretion. The record clearly shows that the defendant had criminal convictions in excess of those needed to establish his range and supports the defendant's fifteen-year sentence.

With regard to case number 4251, the defendant contends that he was not afforded proper supervision during his previous probation. He argues that supervised probation is especially important for defendants convicted of drug-related offenses in order to deter additional criminal activity. He argues that the trial court should have considered this in mitigation of his sentence, which he asserts should be the presumptive, twelve-year minimum for these convictions. The trial court found that the defendant had been placed on unsupervised probation for his eight-year sentences for the 1994 drug offenses. It applied enhancement factor (8) because the defendant was still serving this probationary term at the time he committed the present offenses. However, it chose to give this factor little weight because the probation was unsupervised. Thus, we believe that the trial court did take into account the fact that the defendant's probation was unsupervised. In light of the defendant's extensive history of criminal convictions, the record supports the fifteen-year sentences imposed by the trial court.

The defendant also contends that the trial court should have sentenced him to community corrections because of the length of time between his robbery conviction and the present offense. Only persons convicted of nonviolent felony offenses not involving a weapon and "who do not demonstrate a present or past pattern of behavior indicating violence" nor "a pattern of committing violent offenses" are eligible for community corrections. Tenn. Code Ann. § 35-40-106(a)(3)-(6). Even if a defendant's prior felony convictions do not constitute a pattern of violence, the trial court retains discretion to exclude a defendant from a community corrections program based upon his or her prior felony convictions. See Tenn. Code Ann. § 40-35-106(b). In the present case, the trial court denied community corrections based upon the defendant's 1992 conviction for robbery. It also noted that although the present convictions were for drug-related offenses, it did not "feel that it's a proper

case to try the defendant on alternate sentencing due to the prior convictions that the defendant has and the record that the defendant has."

We note that even if a defendant meets the minimum eligibility requirements for community corrections, he or she is not automatically entitled to a community corrections sentence. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987). A sentence of confinement should be based on the need to protect society by restraining a defendant with a long history of criminal conduct, to avoid depreciating the seriousness of the offense, or to deter effectively others who are likely to commit similar offenses. Tenn. Code Ann. § 40-35-103(1)(A)-(C); see Ashby, 823 S.W.2d at 169. Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Tenn. Code Ann. § 40-35-103(5). The evidence does not preponderate against the trial court's finding that the defendant's history of convictions required a sentence of confinement. We also note that the defendant's admitted daily use of cocaine constitutes criminal conduct. The defendant's parole violation, the fact that he committed the instant offenses while on probation, and his continued abuse and distribution of cocaine despite prior convictions for delivery of cocaine reflect poorly upon his amenability to rehabilitation. The trial court properly imposed a sentence of incarceration.

Based upon the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE